BRYAN J. HARRISON, ESQ. (SBN 277312)
bryan@h-klaw.com
EDI KRISTOPHER, ESQ. (SBN 284833)
edi@h-klaw.com
MICHAEL J. BASSETT, ESQ. (SBN 357048)
michael@h-klaw.com
**HARRISON | KRISTOPHER, LLP**
301 E. Colorado Blvd., Ste. 323
Pasadena, California 91101
Telephone: (866) 529-6155
Facsimile: (866) 565-6206

HOSSEIN KHATAMI, ESQ. (SBN 278350)
hoss@khatamilaw.com
**KHATAMI LAW, P.C.**
2140 Professional Dr., Ste. 150
Roseville, California 95661
Telephone: (916) 788-4445
Facsimile: (916) 788-4447

Legal Counsel for Plaintiffs

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MELISSA GRIMES, an individual, as Successor in Interest to MALIK JOSHUA CAMPBELL, Deceased; CARLOS CAMPBELL, an individual, as Successor in Interest to MALIK JOSHUA CAMPBELL, Deceased, <br><br> Plaintiff, <br><br> vs. <br><br> CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION; JASON E. RELOCKE, Warden of California Correctional Institution, in his individual capacity; DOES 1 through 50, inclusive, <br><br> Defendants. | CASE NO. <br><br><br> **COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** <br><br> 1. Deprivation of Civil Rights Under 42 U.S.C. § 1983 – Eighth Amendment Failure To Protect; <br> 2. Deprivation of Civil Rights Under 42 U.S.C. § 1983 – Deliberate Indifference To Serious Medical Needs; <br> 3. Deprivation of Civil Rights Under 42 U.S.C. § 1983 – Supervisory Liability; <br> 4. Wrongful Death; |

5. Survival Action;
6. Negligence;
7. Violation of California Government Code § 845.6

*EXCEEDS $35,000.00*

## INTRODUCTION

1.      This civil rights action arises from the preventable and foreseeable death of Malik Joshua Campbell, a twenty-six-year-old man who was killed in his cell at California Correctional Institution ("CCI") in Tehachapi, California on September 9, 2025, while in the custody of the California Department of Correction and Rehabilitation ("CDCR"). Mr. Campbell's death was the direct and proximate result of Defendants' deliberate indifference to his safety – a pattern of conduct so egregious, so systemic, and so reckless that it shocks the conscience.

2.      Mr. Campbell did not die in silence. In the evening hours before his death, he cried out in pain. He complained of severe stomach pain to inmates in adjacent cells. He called for help. His cellmate told him to lie down. And then, for the next eighteen or more hours, while Mr. Campbell lay dying in his cell, not a single correctional officer checked on him. Not when his cell window was covered – a clear violation of CDCR policy requiring a "clear and unobstructed view into the cell." Not when he failed to appear for breakfast. Not during any of the dozens of mandatory welfare checks that should have occurred but did not. Mr. Campbell was not discovered until 4:30 p.m. the following day – a delay so prolonged that it demonstrates Defendants' utter disregard for his constitutional right to be free from cruel and unusual punishment.

3.      This catastrophic failure was not an isolated incident. It was the third cellmate-on-cellmate homicide at CCI in 2025 alone – following the deaths of Parrish Duren on April 5, 2025, and Michael Doss on August 11, 2025. Three deaths in five months. Three incarcerated

persons killed by their cellmates at the same institution. Each time, Defendants had actual notice of the danger. Each time, they failed to act. Each time, a man died.

4. The pattern of violence at CCI was so severe that in March 2025 – six months before Mr. Campbell's death – CDCR placed CCI and ten other high-security prisons on "modified program" in response to what officials described as a "surge in violence against staff and incarcerated persons." At the pace of homicides in early 2025, California's prison system was on track to nearly double the 24 homicides reported in 2024. Defendants knew of this crisis. They acknowledged this crisis. And yet they did nothing to prevent Mr. Campbell's death.

5. On information and belief, the violence epidemic at CCI was caused, at least in part, by chronic and severe understaffing that prevented correctional officers from conducting required welfare checks, monitoring cell conditions, and responding to inmates in distress.

6. Plaintiffs bring this action to hold Defendants accountable for their deliberate indifference to Mr. Campbell's constitutional rights and to ensure that no other family must endure the preventable loss of their loved one due to the systemic failures at CCI.

## PARTIES

7. Plaintiff MELISSA GRIMES is an individual and resident of the State of Nevada. Ms. Grimes is the natural mother of decedent Malik Joshua Campbell. Ms. Grimes brings this action individually and as a successor in interest to Malik Joshua Campbell pursuant to California Code of Civil Procedure sections 377.30 and 377.60.

8. Plaintiff CARLOS CAMPBELL is an individual and resident of the State of Florida. Mr. Campbell is the natural father of decedent Malik Joshua Campbell. Mr. Campbell brings this action individually and as a successor in interest to Malik Joshua Campbell pursuant to California Code of Civil Procedure sections 377.30 and 377.60.

9. Defendant CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION ("CDCR") is a department of the State of California responsible for the operation of the state prison system, including California Correctional Institution in Tehachapi,

California. CDCR is named as defendant for purposes of Plaintiffs' state law claims only, following compliance with the California Government Claim Act.

10. Defendant JASON E. RELOCKE is, and at all times relevant hereto was, the Warden of California Correctional Institution. Defendant Relocke is sued in his individual capacity. As Warden, Defendant Relocke had ultimate supervisory responsibility for the safety and security of all incarcerated persons housed at CCI, including Malik Joshua Campbell. Defendant Relocke had actual knowledge of the pattern of cellmate-on-cellmate homicides at CCI in 2025, the systemic violence that led to CDCR's modified program order in March 2025, and the chronic understaffing that prevented correctional officers from conducting required welfare checks. Despite this knowledge, Defendant Relocke failed to implement adequate measures to protect Mr. Campbell from the substantial risk of serious harm.

11. Defendants DOES 1 through 20 are sued in their individual capacities. Plaintiffs are informed and believe, and on that basis allege, that DOES 1 through 20 are, at all times relevant hereto were, correctional officers, lieutenants, sergeants, captains, and/or other custody staff employed by CDCR and assigned to CCI. These Defendants were responsible for conducting welfare checks in compliance with CDCR regulations and the Department Operations Manual, responding to inmate complaints, monitoring cell conditions, and ensuring the safety of incarcerated persons, including Mr. Campbell. These Defendants failed to conduct any welfare check on Mr. Campbell for a period of approximately eighteen hours or more, despite being required by policy to check on him at intervals not exceeding 35 minutes. Plaintiffs will amend this Complaint to state the true names and capacities of these Defendants when ascertained.

12. Defendants DOES 21 through 40 are sued in their individual capacities. Plaintiffs are informed and believe, and on that basis allege, that DOES 21 through 40 are, and at all times relevant hereto were, supervisory officials, administrators, and/or classification staff employed by CDCR and assigned to CCI or CDCR headquarters. These Defendants were responsible for developing and implementing policies regarding cell assignments, inmate

classification, safety protocols, staffing levels, and violence prevention. Plaintiffs will amend this Complaint to state the true names and capacities of these Defendants when ascertained.

13. Defendants DOES 41 through 50 are, and at all times relevant hereto were, agents, servants, employees, or alter egos of the other named Defendants, acting within the course and scope of their agency or employment. Plaintiffs will amend this Complaint to state the true names and capacities of these Defendants when ascertained.

14. Plaintiffs are informed and believe, and on that basis allege, that each of the Defendants was the agent, servant, employee, co-conspirator, joint venturer, or alter ego of each of the remaining Defendants and, in doing the acts hereinafter alleged, was acting within the course and scope of such agency, employment, conspiracy, or joint venture.

**JURISDICTION AND VENUE**

15. This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, as this action arises under the Constitution and laws of the United States, specifically, 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution.

16. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as they arise from the same nucleus of operative facts as the federal claims.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the events giving rise to this action occurred at California Correctional Institution, located in Kern County, California, within the Eastern District of California.

18. Plaintiffs have complied with the claim presentation requirements of the California Government Claims Act, California Government Code sections 900 et seq., by presenting a timely government tort claim prior to filing this action.

/ /

## FACTUAL ALLEGATIONS

**A.  CDCR's Mandatory Welfare Check Requirements**

19.     CDCR's Department Operations Manual ("DOM") and California Code of Regulations, Title 15, establish mandatory requirements for security and welfare checks of incarcerated persons.

20.     Section 3343.1 of the California Code of Regulations, Title 15, Division 3, requires that "Security/welfare checks must be completed on all incarcerated persons housed in Restricted Housing Units" and that "Staff shall utilize the statewide security/welfare tracking system to ensure security/welfare checks are being completed at staggered (non-regular) intervals, not exceeding 35 minutes between each security/welfare check."

21.     A "Security/Welfare Check" is defined by regulation as "a personal observation by a correctional officer of the welfare of the incarcerated person and the security of the cell in which an incarcerated person is housed. It shall include a visual and physical observation of a living breathing incarcerated person, free from obvious injury, ensuring a clear and unobstructed view into the cell, and looking for damage to the cell or signs of any misconduct or self-injurious behavior."

22.     The requirement of "a clear and unobstructed view into the cell" is critical to the welfare check process. A covered cell window – such as the one in Mr. Campbell's cell – prevents staff from observing the condition of the incarcerated person and defeats the purpose of the welfare check entirely.

23.     CDCR Form 3070, the Security/Welfare Check Manual Tracking Sheet, requires that checks be completed at least twice per hour at staggered intervals not exceeding 35 minutes. This means that over an eighteen-hour period, a minimum of approximately 31 welfare checks should have been conducted on Mr. Campbell's cell. On information and belief, none were.

24.     CDCR Form 114, the Housing Unit Isolation Logbook, requires staff to "document any instance in which a security/welfare check could not be completed within the

required time frame." On information and belief, no such documentation was created because Defendants made no attempt to conduct welfare checks on Mr. Campbell's cell.

**B. Background on Malik Joshua Campbell**

25.    Malik Joshua Campbell was born on or about 1999 and was twenty-six years old at the time of his death.

26.    Mr. Campbell was received by CDCR from San Diego County on October 23, 2024. He was sentenced to state prison on charges that included a gang enhancement pursuant to Penal Code section 186.22. This gang enhancement was known to CDCR and should have been a material factor in any cellmate compatibility assessment.

27.    At the time of his death, Mr. Campbell was housed at California Correctional Institution (CCI) in Tehachapi, California, a facility that houses medium, maximum, and high-security incarcerated persons.

28.    Mr. Campbell had been incarcerated at CCI for approximately eleven months prior to his death—eleven months during which Defendants exposed him daily to the same lethal risks that had already claimed two lives at CCI in 2025. Despite knowing that cellmates were killing each other at this facility, Defendants' classification system failed to implement the enhanced screening, compatibility assessments, or protective measures that the pattern of homicides demanded. The system did not identify Donte Walker as a threat to Mr. Campbell. That failure was not mere error; it was the predictable result of a classification process that Defendants knew was grossly deficient and yet refused to reform, even as the bodies accumulated.

**C. The Crisis of Violence at CCI and CDCR's Actual Knowledge**

29.    Mr. Campbell's death was not an isolated incident. It was the third cellmate-on-cellmate homicide at CCI in calendar year 2025 - a pattern that demonstrates both a systemic failure to protect incarcerated persons and Defendants' actual knowledge of the substantial risk of serious harm.

30. The First Homicide: On April 5, 2025, incarcerated person Parrish Duren, age 38, was found unresponsive in his cell at CCI with visible injuries after his cellmate Demetrius Cole alerted staff that he was "feeling distressed." When officers entered the cell, the found Mr. Duren already dead or dying. Mr. Duren was pronounced deceased at 8:55 a.m. His cellmate was placed on restrictive housing pending investigation. This homicide constituted actual, undeniable notice that the very act of assigning cellmates at CCI without enhanced screening, monitoring, and protection, exposed incarcerated persons to a substantial risk of being killed.

31. The Second Homicide: On August 11, 2025, incarcerated person Michael Doss, age 57, was found unresponsive in his cell at CCI with visible wounds at 8:04 a.m. His cellmate, Jake Raper, was restrained and removed from the cell. Life-saving measures were performed, but Mr. Doss was pronounced deceased at 8:44 a.m. No weapon was recovered at the scene. This second homicide did not merely provide Defendants with additional information but compelled them to recognize that cellmates at CCI were killing each other, that this risk was not only substantial, but escalating, and that their continued inaction would result in more deaths. Defendants possessed that knowledge on August 11, 2025. They disregarded it for 29 days until Malik Campbell became the third victim.

32. The Third Homicide: On September 9, 2025, Mr. Campbell was found unresponsive in his cell at CCI at approximately 4:30 p.m. His cellmate, Donte Walker, was removed from the cell. Life-saving measures were initiated, but Mr. Campbell was pronounced deceased at 5:04 p.m. No weapon was recovered at the scene. The Kern County Coroner classified the death as a homicide.

33. This pattern of three cellmate-on-cellmate homicides at a single institution within a five-month period is extraordinary and demonstrates a systemic failure to adequately screen cellmate assignments, monitor high-risk housing situations, and protect vulnerable incarcerated persons from violence. Defendants knew of this pattern and consciously disregarded the risk it posed to Mr. Campbell.

/ /

**D. The Statewide Violence Crisis and CDCR's Acknowledged Failure**

34.     The violence at CCI was part of a broader crisis across the California prison system that Defendants acknowledged and yet failed to adequately address.

35.      In March 2025 – six months before Mr. Campbell's death – CDCR acknowledged a "surge in violence against staff and incarcerated persons" and placed eleven high-security prisons, including CCI, on "modified program." The modified program restricted visits, phone calls, and movement at Level IV high-security sections.

36.     The modified program order identified CCI by name as one of the facilities experiencing a surge in violence. This order constitutes an admission by CDCR that it knew of the substantial risk of violence at CCI months before Mr. Campbell was killed.

37.     At the pace of homicides in early 2025, the California prison system was on track to nearly double the 24 homicides reported in 2024. This trend was known to CDCR leadership and to the individual Defendants before Mr. Campbell's death.

38.     Despite this acknowledged crisis, and despite two prior cellmate homicides at CCI in 2025, Defendants failed to implement adequate protective measures to prevent Mr. Campbell's death.

**E. Chronic Understaffing at CCI**

39.     On information and belief, California Correctional Institution was, at all times relevant hereto, grossly understaffed with correctional officers, which directly contributed to the failure to conduct mandatory welfare checks on Mr. Campbell and the broader pattern of violence at the facility.

40.     On information and belief, CDCR has experienced a nationwide correctional officer staffing crisis, with vacancy rates at some facilities exceeding 30-50%. This staffing shortage has resulted in correctional officers being unable to conduct required welfare checks, security rounds, and other duties essential to inmate safety.

41.     On information and belief, the understaffing at CCI was so severe that correctional officers were routinely unable to conduct welfare checks at the intervals required

by CDCR policy – i.e., at least once every 35 minutes. This systemic failure directly contributed to the eighteen-hour or longer gap during which no one checked on Mr. Campbell.

42. On information and belief, Defendants knew that understaffing at CCI prevented correctional officers from conducting required welfare checks and created an environment in which violence could occur undetected for extended periods. Despite this knowledge, Defendants failed to allocate adequate staffing resources to CCI or to modify operations to ensure inmate safety.

43. The failure to conduct a single welfare check on Mr. Campbell for eighteen or more hours cannot be attributed to one officer's negligence or one shift's failure. It represents a complete, systemic collapse, a facility so understaffed that the most basic constitutional safeguard, a simple check to determine whether an incarcerated person is alive, did not occur for 31 consecutive required intervals. Defendants knew this collapse was happening. They knew officers could not keep up with mandatory welfare checks. They knew it was only a matter of time before someone died as a result. And they did nothing. That is the very essence of deliberate indifference.

F. The Eighteen Hours of Deliberate Indifference: A Timeline of Failure

44. The circumstances of Mr. Campbell's death reveal a pattern of deliberate indifference so pervasive that it constitutes cruel and unusual punishment in violation of the Eighth Amendment.

45. On the evening of September 8, 2025, Malik Campbell was in distress. He suffered severe stomach pain. He called out for help. His cries were loud enough that inmates in neighboring cells heard them clearly. A welfare check at any point would have revealed his condition. But no welfare check came. No officer responded. Malik Campbell was left alone in his cell with Donte Walker – the man who would kill him before anyone bothered to check whether he was still alive.

46. At some point during the evening, the window to Mr. Campbell's cell was covered, obscuring any view of the cell's interior from outside. This directly violated CDCR's

regulatory requirement that welfare checks ensure "a clear and unobstructed view into the cell." A covered cell window is a red flag that should trigger immediate investigation. On information and belief, no investigation occurred.

47.     Night of September 8-9, 2025 – The Failure to Conduct Welfare Checks: Under CDCR policy, correctional officers were required to conduct welfare checks on Mr. Campbell's cell at intervals not exceeding 35 minutes throughout the night. This means that between 10:00 p.m. and 6:00 a.m., a minimum of approximately 14 welfare checks should have been conducted. On information and belief, none were. Had any welfare checks been conducted, staff would have discovered that the cell window was covered and would have been required to investigate.

48.     Morning of September 9, 2025 – Mr. Campbell's Absence from Breakfast: Mr. Campbell did not appear for breakfast on the morning of September 9, 2025. His absence should have triggered an immediate welfare check to determine why an incarcerated person had not emerged from his cell for a scheduled meal. On information and belief, no welfare check was conducted in response to his absence.

49.     Throughout the Day – Continued Failure: Between breakfast and 4:30 p.m., an additional approximately 17 welfare checks should have been conducted on Mr. Campbell's cell under CDCR policy. On information and belief, none were. The cell window remained covered. Mr. Campbell lay dead or dying inside.

50.     4:30 p.m. on September 9, 2025 - Discovery: At approximately 4:30 p.m. – approximately 18 hours or more after Mr. Campbell first complained of pain – staff finally discovered him unresponsive in his cell. By then, it was far too late. Life-saving measures were initiated, but Mr. Campbell was pronounced deceased at 5:04 p.m.

51.     In total, Defendants failed to conduct any meaningful welfare checks on Mr. Campbell for a period of approximately eighteen hours or more, despite being required to check on him at least 31 times during that period. This wholesale abandonment of constitutional duty constitutes deliberate indifference as a matter of law.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

**G. The Cell Assignment: Failure to Protect**

52.     On September 9, 2025, Mr. Campbell was housed in a cell with Donte Walker at CCI.

53.     Donte Walker had been received by CDCR from Sacramento County on June 16, 2022. He was serving a four-year sentence for second-degree robbery as a second striker—a designation indicating a prior serious or violent felony conviction. Walker also received an additional eight-month sentence from Placer County on November 2, 2022, for conspiracy to commit a crime. On information and belief, Walker's central file contained additional indicators of violence, institutional misconduct, or incompatibility factors that should have precluded his housing with Mr. Campbell. On information and belief, Defendants failed to review, ignored, or disregarded this information when assigning Walker as Mr. Campbell's cellmate.

54.     Mr. Campbell had a gang enhancement on his commitment offense, indicating documented gang involvement that was known to CDCR. On information and belief, this gang involvement created compatibility concerns that should have been considered in cell assignment decisions.

55.     On information and belief, Defendants failed to adequately screen the compatibility of Mr. Campbell and Mr. Walker before housing them together, despite the known risks of cellmate violence at CCI and Mr. Campbell's documented gang involvement.

56.     On information and belief, CDCR's classification and cell assignment policies require consideration of factors including gang affiliation, criminal history, and security concerns when determining cellmate compatibility. Defendants failed to follow these policies in housing Mr. Campbell with Mr. Walker.

**H. The Covered Cell Window: Deliberate Disregard of an Obvious Warning Sign**

57.     At some point before Mr. Campbell's death, the window to his cell was covered preventing any visual observation of the cell's interior.

58.     A covered cell window is a serious security concern and a direct violation of CDCR policy requiring "a clear and unobstructed view into the cell" during welfare checks.

59. A covered cell window should have been immediately identified during any welfare check and should have triggered immediate investigation and removal of the obstruction.

60. On information and belief, the covered cell window undetected because Defendants failed to conduct any welfare checks on Mr. Campbell's cell for approximately eighteen hours or more.

61. The failure to detect and respond to the covered cell window is direct evidence of Defendants' deliberate indifference to Mr. Campbell's safety and their wholesale failure to comply with mandatory welfare check requirements.

## I. Family Notification and Aftermath

62. Plaintiff Melissa Grimes was notified of her son's death by Lieutenant Anderson of CCI at approximately 6:32 p.m. on September 9, 2025, and again at 8:30 p.m.

63. Ms. Grimes viewed her son's body following his death.

64. Mr. Walker was placed in restricted housing following Mr. Campbell's death. The investigation is being conducted by the CCI Investigative Services Unit and the Kern County District Attorney's Office.

65. As a result of Mr. Campbell's death, Plaintiffs have suffered and continue to suffer severe emotional distress, grief, loss of companionship, and other damages.

### FIRST CAUSE OF ACTION
**Deprivation of Civil Rights Under 42 U.S.C. § 1983 – Eighth Amendment Failure to Protect**
**(Against Defendants RELOCKE and DOES 1 through 50)**

66. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

67. At all times relevant hereto, Mr. Campbell was an incarcerated person in the custody of CDCR and was entitled to the protection of the Eight Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment.

68.    The Eighth Amendment imposes a duty on prison officials to protect inmates from violence at the hands of other prisoners. *Farmer v. Brennan* (1994) 511 U.S. 825, 833. A prison official violates this duty when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious; and (2) the prison official is, subjectively, deliberately indifferent to inmate safety. *Id.* at 834.

69.    A prison official is deliberately indifferent if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the indifference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

70.    Here, Defendants knew of a substantial risk of serious harm to Mr. Campbell based on multiple independent facts, each of which was sufficient to establish actual knowledge:

    a.    First, Defendants knew of the pattern of cellmate-on-cellmate homicides at CCI. The deaths of Parrish Duren on April 5, 2025, and Michael Doss on August 11, 2025 – both killed by their cellmates at CCI – put Defendants on actual notice that incarcerated persons housed in cells at CCI faced a substantial risk of being killed by their cellmates.

    b.    Second, Defendants knew of the statewide violence crisis that led to the modified program order in March 2025. This order specifically identified CCI as one of the facilities experiencing a "surge in violence" and constitutes an admission of Defendants' actual knowledge of that risk.

    c.    Third, Defendants knew that Mr. Campbell was complaining of severe stomach pain and calling out for help in the evening hours before his death. Other inmates in adjacent cells heard his cries clearly. On information and belief, Mr. Campbell's cries were audible to correctional officers in the housing unit, and one or more officers heard his distress and failed to respond.

/ /

d.    Fourth, Defendants knew – or would have known had they conducted any welfare checks – that the window to Mr. Campbell's cell was covered, preventing visual observation of the cell's interior. A covered cell window is a recognized warning sign of potential danger.

e.    Fifth, Defendants knew that Mr. Campbell failed to appear for breakfast on the morning of September 9, 2025 – an absence that should have triggered an immediate welfare check.

71.    Despite this actual knowledge, Defendants failed to take any reasonable measures to protect Mr. Campbell. Their failures included:

a.    Failing to conduct welfare checks on Mr. Campbell's cell for approximately eighteen (18) hours or more, despite being required to check on him at least 31 times during that period under CDCR policy requiring checks at intervals not exceeding 35 minutes;

b.    Failing to detect and respond to the covered cell window, which prevented visual observation of the cell and should have triggered immediate investigation;

c.    Failing to respond to Mr. Campbell's absence from breakfast;

d.    Failing to adequately screen cellmate compatibility before housing Mr. Campbell with Mr. Walker;

e.    Failing to maintain adequate staffing levels to conduct required welfare checks; and

f.    Failing to implement additional protective measures in response to the two prior cellmate homicides at CCI in 2025.

72.    The eighteen-hour gap during which no welfare check was conducted on Mr. Campbell's cell is itself evidence of deliberate indifference. Under CDCR policy, welfare checks must be conducted at intervals not exceeding 35 minutes. The failure to conduct a single check for eighteen hours demonstrates a wholesale disregard for Mr. Campbell's safety that goes far beyond mere negligence.

73.    As a direct and proximate result of Defendants' deliberate indifference, Mr. Campbell was killed in his cell, and Plaintiffs have suffered damages including but not limited to loss of companionship, emotional distress, funeral expenses, and other compensatory and special damages.

74.    Defendants' conduct was malicious, oppressive, and in reckless disregard of Mr. Campbell's constitutional rights, entitling Plaintiffs to an award of punitive damages.

## SECOND CAUSE OF ACTION
**Deprivation of Civil Rights Under 42 U.S.C. § 1983 –
Deliberate Indifference to Serious Medical Needs
(Against Defendants RELOCKE and DOES 1 through 50)**

75.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

76.    The Eighth Amendment requires prison officials to provide inmates with adequate medical care. *Estelle v. Gamble* (1976) 429 U.S. 97, 104. A prison official violates this duty when he is deliberately indifferent to an inmate's serious medical needs. *Id.* at 104-05.

77.    Mr. Campbell had a serious medical need. He complained of severe stomach pain in the evening hours before his death. He called out for help. These complaints put Defendants on notice that Mr. Campbell required medical attention.

78.    Defendants were deliberately indifferent to Mr. Campbell's serious medical need. Despite his complaints of severe pain, no one checked on him for approximately eighteen hours. No one summoned medical care. No one investigated why he failed to appear for breakfast. By the time he was discovered at 4:30 p.m., it was too late.

79.    Had Defendants conducted even a single welfare check in response to Mr. Campbell's complaints of pain, his need for medical attention would have been apparent. Had they responded to his absence from breakfast, they would have discovered him in distress and could have summoned medical care.

80.     As a direct and proximate result of Defendants' deliberate indifference to Mr. Campbell's serious medical needs, he died without receiving any medical treatment, and Plaintiffs have suffered damages as set forth above.

81.     Defendants' conduct was malicious, oppressive, and in reckless disregard of Mr. Campbell's constitutional rights, entitling Plaintiffs to an award of punitive damages.

## THIRD CAUSE OF ACTION
### Deprivation of Civil Rights Under 42 U.S.C. § 1983 – Supervisory Liability
### (Against Defendant RELOCKE and DOES 21 through 40)

82.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

83.     Defendant Relocke, as Warden of CCI, and Defendants DOES 21 through 40, as supervisory officials, had a duty to implement adequate policies, procedures, training, and staffing to protect incarcerated persons from violence and to ensure compliance with mandatory welfare check requirements.

84.     Supervisory officials may be held liable under § 1983 if they "set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which they knew or reasonably should have known would cause others to inflict constitutional injury." *Starr v. Baca*, 652 F.3d 1202, 1207-08 (9th Cir. 2011).

85.     Here, Defendant Relocke and supervisory Defendants knew of the following facts that created a substantial risk of constitutional injury:

a.     The pattern of cellmate-on-cellmate homicides at CCI in 2025, including two deaths before Mr. Campbell was killed;

b.     The statewide violence crisis that led to the march 2025 modified program order;

c.     The chronic understaffing at CCI that prevented correctional officers from conducting required welfare checks; and

d.     The systemic failure to comply with CDCR policies requiring welfare checks at intervals not exceeding 35 minutes.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

86. Despite this knowledge, Defendant Relocke and supervisory Defendants failed to implement adequate measures to prevent further violence and ensure compliance with welfare check requirements. Their deliberate indifference to these known risks directly and proximately caused Mr. Campbell's death.

87. As a direct and proximate result of Defendants' deliberate indifference, Mr. Campbell was killed, and Plaintiffs have suffered damages as set forth above.

88. Defendants' conduct was malicious, oppressive, and in reckless disregard of Mr. Campbell's constitutional rights, entitling Plaintiffs to an award of punitive damages.

## FOURTH CAUSE OF FACTION
### Wrongful Death
### (Against All Defendants)

89. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraph as though fully set forth herein.

90. This cause of action is brought by Plaintiffs pursuant to California Code of Civil Procedure section 377.60, as successors in interest to Malik Joshua Campbell.

91. Defendants owed a duty of care to Mr. Campbell to protect him from foreseeable violence while in their custody and to conduct welfare checks as required by CDCR policy.

92. Defendants breached their duty of care by failing to protect Mr. Campbell from the substantial and foreseeable risk of violence posed by his cellmate, by failing to conduct mandatory welfare checks for approximately eighteen hours, by failing to respond to warning signs of danger, and by failing to implement adequate policies and procedures to prevent cellmate-on-cellmate homicides.

93. As a direct and proximate result of Defendants' breach of duty, Mr. Campbell was killed.

94. As a direct and proximate result of Mr. Campbell's death, Plaintiffs have suffered and will continue to suffer damages, including but not limited to: loss of love, companionship,

comfort, care, assistance, protection, affection, society, and moral support; funeral and burial expenses; and reasonable value of household services.

## FIFTH CAUSE OF ACTION
### Survival Action
### (Against All Defendants)

95. Plaintiffs incorporate by reference each and every allegation contained in in the preceding paragraphs as though fully set forth herein.

96. This cause of action is brought by Plaintiffs pursuant to California Code of Civil Procedure section 377.30, as successors in interest to Malik Joshua Campbell, for the damages Mr. Campbell suffered before his death.

97. As a direct and proximate result of Defendants' wrongful conduct, Mr. Campbell suffered physical pain, emotional distress, and fear before his death.

98. Mr. Campbell was conscious and aware of his condition for an extended period before his death. He complained of severe stomach pain. He called out for help. He experienced terror and anguish as he lay dying in his cell for hours without any response from correctional staff.

99. Plaintiffs, as successors in interest, are entitled to recover all damages that Mr. Campbell would have been entitled to recover had he survived, including but not limited to damages for pain and suffering, emotional distress, and fear of impending death.

## SIXTH CAUSE OF ACTION
### Negligence
### (Against All Defendants)

100. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

101. Defendants owed a duty of care to Mr. Campbell to exercise reasonable care in protecting him from foreseeable harm while he was in their custody, including conducting welfare checks as required by CDCR policy.

102. Defendants breached their duty of care by, among other things:

a. Failing to conduct welfare checks at intervals not exceeding 35 minutes as

required by policy;

b.      Failing to detect and respond to the covered cell window;

c.      Failing to respond to Mr. Campbell's absence from breakfast;

d.      Failing to respond to reports of Mr. Campbell's distress;

e.      Failing to adequately assess cellmate compatibility;

f.      Failing to maintain adequate staffing levels; and

g.      Failing to implement adequate policies and training to prevent cellmate violence.

103.    Defendants' breach of their duty of care was a substantial factor in causing Mr. Campbell's death.

104.    As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered damages as set forth above.

### SEVENTH CAUSE OF ACTION
**Violation of California Government Code Section 845.6**
**(Against All Defendants)**

105.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

106.    California Government Code section 845.6 provides that a public employee and the public entity are liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and fails to take reasonable action to summon such medical care.

107.    Mr. Campbell complained of severe stomach pain in the evening hours before his death. He called out for help multiple times. Other inmates heard his distress and were aware of his complaints.

108.    Defendants knew or had reason to know that Mr. Campbell was in need of immediate medical care based on his complaints of severe pain and distress.

109.    Defendants failed to take reasonable action to summon medical care for Mr. Campbell. Instead, they failed to check on him for approximately eighteen hours, during which time he died without receiving any medical attention.

110. As a direct and proximate result of Defendant's failure to summon medical care, Mr. Campbell died without receiving any medical treatment.

111. Plaintiffs are entitled to recover damages from Defendants for their violation of Government Code section 845.6.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

1. For general damages according to proof;

2. For special damages according to proof;

3. For punitive and exemplary damages against the individual Defendants pursuant to 42 U.S.C. § 1983;

4. For reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988;

5. For costs of suit incurred herein;

6. For pre-judgment and post-judgment interest as allowed by law; and

7. For such other and further relief as the Court may deem just and proper.

Dated:    December 10, 2025              **HARRISON | KRISTOPHER, LLP**

By:    Bryan J. Harrison, Esq.
Edi Kristopher, Esq.
Attorneys for Plaintiffs

/    /

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury in this action.

Dated:　December 10, 2025　　　　　　　**HARRISON | KRISTOPHER, LLP**

　　　　　　　　　　　　　　　　　　　　　　By:　　Bryan J. Harrison, Esq.
　　　　　　　　　　　　　　　　　　　　　　　　　Edi Kristopher, Esq.
　　　　　　　　　　　　　　　　　　　　　　　　　Attorneys for Plaintiffs

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

22